**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LINDA BRANCA, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 13-740 |
| LIBERTY LIFE ASSURANCE CO. OF | : | |
| BOSTON, | : | |
| Defendant. | : | |

## MEMORANDUM

BUCKWALTER, S. J.                                                                                       April 3, 2014

Pending before the Court are Plaintiff Linda Branca ("Plaintiff")'s Motion for Summary

Judgment and Defendant Liberty Life Assurance Company of Boston ("Liberty Life")'s Motion

for Summary Judgment.  For the following reasons, Liberty Life's Motion for Summary

Judgment is denied and Plaintiff's Motion for Summary Judgment is granted in part and denied

in part.

## I.       FACTUAL AND PROCEDURAL HISTORY[1]

Plaintiff Linda Branca is an individual residing in Phoenixville, Pennsylvania.  (Compl. ¶

2.)  Defendant Liberty Life is a New Hampshire corporation with its principal place of business

in Massachusetts.  (Answer ¶ 3.)

The crux of the present case centers on Plaintiff's claim, under section 502(a)(1)(B) of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for

disability benefits pursuant to an insurance policy administered and funded by Defendant Liberty

---

[1] The statement of facts is compiled from a review of the parties' briefs and the evidence
submitted in conjunction with those briefs. To the extent the parties allege a fact that is
unsupported by evidence, the Court does not include it in the recitation of facts.

Life.  Liberty Life denied both Plaintiff's initial claim and her subsequent appeal.  The present litigation challenges the propriety of that decision.

In order to conduct the appropriate judicial review of the administrator's decision, a court must look to the whole record, consisting of all evidence before the administrator when the decision was made.  Doyle v. Nationwide Ins. Cos. & Affiliates Emp. Health Care Plan, 240 F. Supp. 2d 328, 335 (E.D. Pa. 2003).  As such, this Court first reviews the administrative record relevant to the decision in this case.

A.    Yellowbook's Group Long-Term Disability Policy with Liberty Life

Starting on September 9, 2002, Plaintiff worked for Yellowbook, Inc. ("Yellowbook") as a sales representative.  (R. at LL-0055, LL-0060.)[2]  Through her employment at Yellowbook, she participated in a group long-term disability insurance policy from Defendant Liberty Life.  (R. at LL-0047.)  That policy became effective on October 1, 2008.  (Id.)  The policy provides for payments of long-term disability benefits for disabled insureds.  (Id.)  The policy defines "Disability or Disabled" as follows:

> a.    i.    if the Covered Person is eligible for the 24 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period[3] and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial

---

[2] As this is a review of a closed administrative record, both Plaintiff Branca and Defendant Liberty Life cite to the Declaration of Paula McGee (Litigation Manager for Liberty Life) and the policy and administrative record relating to Plaintiff's claim, attached as Exhibits A and B, respectively. These exhibits constitute 302 continuously numbered pages (LL-0001 through LL-0302).  Accordingly, the Court will refer the exhibits attached to the Declaration of Paula McGee as "the Record" ("R.").

[3] The policy defines "Elimination Period" as "a period of consecutive days of Disability or Partial Disability for which no benefit is payable.  The Elimination Period . . . begins on the first day of Disability."  (R. at LL-0009.)

2

Duties of his Own Occupation; and

ii.     thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material Substantial Duties of Any Occupation.

(<u>Id.</u> at LL-0008.)  "Own Occupation," as the policy defines the term, "means the Covered Person's occupation that he was performing when his Disability or Partial Disability began.  For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy."  (<u>Id.</u> at LL-0012.)  The policy dictates that "Liberty [Life] shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty [Life]'s decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding."  (<u>Id.</u> at LL-0041.)

**B.**     **Plaintiff's Employment at Yellowbook and Accident of January 7, 2010**

In her capacity as a sales representative for Yellowbook, Plaintiff was responsible for traveling to Philadelphia-area businesses on sales calls.  (<u>Id.</u> at LL-0055.)  While on the job, Plaintiff carried with her one tote containing a computer, and another with books and sales materials.  (<u>Id.</u> at LL-0055, LL-0225.)  Plaintiff's job duties required her to stand for one-to-two hours per day, sit for two-to-four hours per day, walk up to five miles per day, and carry up to twenty-five pounds for up to six hours per day.  (<u>Id.</u> at LL-0295–26.)

On January 7, 2010, Plaintiff was visiting a client's office when she fell down a flight of thirteen steps, causing her to lose consciousness and injure her head, hand, wrist, neck, back, hip, and leg.  (<u>Id.</u> at LL-0055, LL-0164, LL-0167, LL-0170, LL-0231.)  After missing work from the date of her accident onward due to her injuries, Plaintiff returned to work on April 19, 2010.  (<u>Id.</u>

at LL-0056.)  Upon enduring chronic neck and back pain, she left her job at Yellowbook

permanently on September 13, 2010.  (Id. at LL-0060, LL-0097, LL-0227.)

### C.    Plaintiff's Treatment for Her Injuries

Between the date of her injury on January 7, 2010 and the filing of her claim on the long-

term disability policy with Liberty Life on July 11, 2011 (see below), Plaintiff received treatment

from several medical professionals.  (Id. at LL-0055–56.)  Among these professionals were Dr.

Jeffrey Rihn, an orthopedic surgeon, Dr. Ari Greis, a physical medicine specialist, Dr. Thomas

Graham, a neurologist, and Dr. Mark Belitsky ("Dr. Belitsky"), a chiropractor.  (Id. at LL-0174,

LL-0197, LL-0213, LL-0233.)

### 1.    Dr. Jeffrey Rihn

On April 27, 2010, Plaintiff saw Dr. Jeffrey Rihn, an orthopedic surgeon.  (R. at LL-

0197.)  At that time, he diagnosed Plaintiff with degenerative stenosis and spondylolisthesis at

the L4 and L5 vertebrae.[1]  (Id.)  However, Dr. Rihn would later note that the Plaintiff "[did] not

feel as though this accident caused symptoms that the patient is currently having."  (Id. at LL-

0194.)

When Plaintiff returned to Dr. Rihn on August 31, 2010, Dr. Rihn further diagnosed

Plaintiff with "multilevel cervical spondylosis most notably at C6-7 with disc ostophyte complex

---

[1] "Stenosis" is a "narrowing of the space at the center of the spine[,] . . . the canals where nerves
branch out from the spine [,] . . . [or] the space between vertebrae."  (What Is Spinal Stenosis?,
Nat'l Inst. of Health, Nat'l Inst. of Arthritis and Musculoskeletal and Skin Diseases,
http://www.niams.nih.gov/Health_Info/Spinal_Stenosis/spinal_stenosis_ff.pdf (last visited Mar.
25, 2014).)
     "Spondylolisthesis" is "a condition in which one vertebra slips forward on another."
(Questions about Spinal Stenosis, Nat'l Inst. of Health, Nat'l Inst. of Arthritis and
Musculoskeletal and Skin Diseases,
http://www.niams.nih.gov/Health_Info/Spinal_Stenosis/default.asp (last visited Mar. 25, 2014).)

4

at C5-6 and C6-7."[2]  (Id. at LL-0191.)  Dr. Rihn noted that "[Plaintiff] has continued severe

symptoms status post a fall in January, which has been unresponsive to conservative treatment"

including "severe low back pain, leg pain and neck pain" and recommended that Plaintiff

undergo "an L4-5 decompression and fusion" to alleviate her back pain.  (Id. at LL-0190–0191.)

On November 30, 2010, Dr. Rihn saw Plaintiff again and noted that she had "persistent

neck pain," "constant . . . back pain," and "severe left leg pain, which goes down the left

posterior thigh down to her knee."  (Id. at LL-0188.)  At that time, Dr. Rihn concluded that while

Plaintiff "did have a history of some intermittent low back pain[,]" he believed "this is an acute

exacerbation of an underlying degenerative condition as a result of her fall."  (Id. at LL-0189.)

### 2.   Dr. Ari Greis

From May 26, 2010 through the filing of her appeal, Plaintiff also received treatment

from Dr. Ari Greis, a physical medicine specialist.  (Id. at LL-0174–75.)  On May 26, 2010, Dr.

Greis administered an epidural steroid injection at the L-4 and L-5 vertebrae in an effort to

relieve her pain.  (Id.)  While she continued to experience left buttock pain with an injection at

the L-5 vertebra, some of her pain was alleviated when injected at the L-4 vertebra.  (Id.)

Later, on September 30, 2010, Dr. Greis noted that Plaintiff continued to experience

"[c]hronic low back pain with radicular symptoms into the left buttock as well as anterolateral

thigh" and "[g]rade I spondylolisthesis at L4-L5 . . . as well as severe central and mild foraminal

narrowing" despite the epidural injections.  (Id. at LL-0162.)  Dr. Greis observed that "she may

need to consider surgery," especially because she had experienced "some side effects from the

---

[2] "Spondylosis" is "a chronic, degenerative process that . . . wears away the surface layer of
cartilage of . . . the facet joints and the disk."  (Questions about Spinal Stenosis, Nat'l Inst. of
Health, Nat'l Inst. of Arthritis and Musculoskeletal and Skin Diseases,

steroids in the way of mouth ulcers."[3]  (Id.)  When Plaintiff returned again on December 27,

2010, Dr. Greis documented Plaintiff's "severe symptoms into the left buttock as well as the

lateral greater than anterior thigh not past the knee."  (Id. at LL-0157.)  In particular, "[Plaintiff's]

symptoms are worse with prolonged sitting, standing, walking, and bad weather[.]"  (Id.)  Even

four months later, on April 25, 2011, Dr. Greis observed that Plaintiff "continues to have chronic

low back and buttock pain. . . . radicular symptoms into the left posterior lateral thigh not past the

knee. . . . a lot of pain in the lateral hip area . . . [Plaintiff] describes the symptoms as an achy,

burning sensation worse with sitting, standing, walking, and bad weather[.]"  (Id. at LL-0153.)

By June 21, 2011, Dr. Greis documented that Plaintiff was still experiencing "[c]hronic low back

pain with radicular symptoms into the bilateral buttock and left posterolateral thigh," as she rated

her pain at "8/10 on the back and 7/10 on the left thigh."  (Id. at LL-0106.)  These symptoms

were made worse by "[s]itting, standing, walking, and bad weather."  (Id.)

### 3.    Dr. Thomas Graham

Plaintiff received additional treatment for her head and neck injuries from Dr. Thomas

Graham, a neurologist.  (Id. at LL-0223–33.)  When Plaintiff saw Dr. Graham on January 20,

2010, she was still experiencing post-concussion symptoms including sensitivity to light,

headache, nausea, dizziness, short-term memory loss, and depression.  (Id. at LL-0231–32.)  Dr.

Graham saw Plaintiff again on March 4, 2010 and recommended against Plaintiff returning to

full-time work due to her chronic pain.  (Id. at LL-0230.)

---

http://www.niams.nih.gov/Health_Info/Spinal_Stenosis/default.asp (last visited Mar. 25, 2014).)

[3] Dr. Graham noted Plaintiff's bad reaction to steroid injections in an August 20, 2010 note,
stating that: "She developed substantial, wide spread, mucosal ulcerations from the prednisone . .
. and the epidural steroids did not provide substantial benefit[.]"  (Id. at LL-0225.)

On August 20, 2010, Dr. Graham wrote a more thorough evaluation of Plaintiff in which he described "substantial spondylosis in the cervical and lumbar spine with foraminal encroachment at multiple levels, but particularly severe on the left in the cervical spine . . . with a severe level of lumbar spinal stenosis in the low back" causing chronic neck and back pain.  (Id. at LL-0226–27.)  In light of Plaintiff's condition, Dr. Graham concluded as follows:

> Whether this patient can ever work again in a job where she is relatively sedentary and motionless in a seated position, or otherwise carrying heavy bags and cases, is unclear.  It would seem from her description that a job in which she could move about, have opportunity for rests, particularly with laying down, might be the ideal circumstance, but I am not certain that such a job exists, or that a job of that type could even be obtained in the current economy. . . . [I]f the next step to address pain so that this patient can continue with her current job would otherwise demand surgery, which seems to be the case in the absence of any other modality likely to be beneficial, I am not certain she has much choice but to leave work if only to avoid the need for surgery.

(Id. at LL-0227.)[4]

### 4.    Dr. Mark Belitsky

Plaintiff also received treatment from Dr. Mark Belitsky, a chiropractor.  (Id. at LL-0213.) Dr. Belitsky saw Plaintiff on June 11, 2010.  (Id.)  In that visit, Dr. Belitsky noted that Plaintiff had suffered a "sprain/strain" of the cervical spine as well as "facet syndrome" of the lumbar spine.  (Id. at LL-0214.)

### D.    Plaintiff's Claim for Long-Term Disability Benefits and Subsequent Appeal

### 1.    Plaintiff's Claim and Liberty Life's Initial Denial

On July 11, 2011, Plaintiff filed a claim on her long-term disability policy with Liberty

---

[4] In a final follow-up visit on February 18, 2011, Dr. Graham noted that Plaintiff had developed a case of spinning vertigo, particularly "when weatherfronts come through[.]"  (R. at LL-0223.)

Life.  (Id. at LL-0056.)  As part of Plaintiff's claim, Liberty Life received records from Drs. Rihn, Greis, Graham, and Belitsky.  (Id. at LL-0129.)

On September 2, 2011, Liberty Life sent a three-page letter to Plaintiff denying her claim for long-term disability benefits.  (Id. at LL-0129–31.)  In the letter stating its reasons for the denial, Liberty Life stated that it had considered the records from Drs. Rihn, Greis, Graham, and Belitsky, as well as the opinion of Dr. Weiss.  (Id.)  In summarizing Plaintiff's records, it noted that Dr. Belitsky's notes were "largely illegible," characterized Dr. Graham's assessment as "doing reasonable [sic] well," and stated that Dr. Rihn "does not verify any weakness in your leg upon exam."  (Id.)  In a more detailed paragraph concerning Dr. Greis's treatment, Liberty Life noted that as of Dr. Greis's last meeting with Plaintiff, "no focal strength deficits are noted in your bilateral lower limbs" and had "mild pain with PA glide at the lumbosacral junction[.]"  (Id. at LL-0130.)

Additionally, Liberty Life informed Plaintiff that it had submitted her file to Dr. Jennifer Weiss, an orthopedic surgeon, for review.  (Id.)  Dr. Weiss found that Plaintiff's medical records supported diagnoses of left hip bursitis, degenerative disc disease in the cervical spine, lumbar spondylosis, and a radial fracture.  (Id. at LL-0136.)  Dr. Weiss opined that Plaintiff was "unlimited" in her ability to sit, stand, walk, and reach overhead.  (Id. at LL-0137.)  Dr. Weiss further stated that Plaintiff could lift, pull, or carry "up to 10 pounds frequently and up to 15 pounds occasionally."  (Id.)  The only activities Dr. Weiss said Plaintiff should never do are "balancing/crawling/stooping/kneeling/walking on uneven surfaces/twisting" and "reaching below waist level."  (Id.)

Liberty Life also submitted all of Plaintiff's medical information to Melissa Michuda, a

vocational rehabilitation consultant, for an "occupational analysis/vocational review."  (Id. at LL-0123.)  Michuda opined that of all the job descriptions in the Directory of Occupational Titles ("DOT"), Plaintiff's job best fit the classification of "Sales Representative, Advertising," and the more general classification of "Advertising Sales Agent" under the Standard Occupational Classification/Occupational Information Network ("SOC/O*NET").  (Id. at LL-0124.)  Under these classifications "[m]ost advertising sales agents work outside the office occasionally, calling on clients at their places of business" and "they may spend much of their time traveling to and visiting prospective advertisers and current clients."  (Id.)  Michuda further researched open advertising sales representative positions on a job search website and found that while there were more than 200 positions that sought "outside sales representatives," another 100 positions were looking for "inside sales representatives."  (Id. at LL-0125.)  Michuda determined that "[t]he typical physical demands of [Plaintiff's] occupation of Advertising Sales Representative are most often performed at both the sedentary and light physical demand categories within the national economy and exist with sufficient opportunity at both levels."  (Id. at LL-0128.)

Based on all of the above information, Liberty Life assessed Plaintiff's case as follows:

> We understand that, while working at Yellowbook, you must frequently drive, sit 2–4 hours a day, stand 1–2 hours a day, walk up to 5 miles per day, and carry up to 25 pounds up to 6 hours a day.  However, based on research performed by a Vocational Consultant, your occupation as a Sales Representative, Advertising as defined in the national economy, requires sedentary capacity. Sedentary capacity includes exerting up to 10 pounds of force occasionally, and/or a negligible amount of force frequently to lift, push, pull, carry, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.  These requirements are within your functional capabilities based on the review of the

> medical information received and therefore, you are capable of
> performing your occupation with a different employer. . . .
> Therefore, we must deny your claim for benefits.

(Id. at LL-0130.)  Liberty Life informed Plaintiff that she had 180 days from the receipt of its

letter to appeal the denial of her claim.  (Id. at LL-0131.)

### 2.      Plaintiff's Appeal and Liberty Life's Denial on Appeal

On February 22, 2012, Plaintiff, through her counsel, sent a letter to Liberty Life

appealing its denial of long-term disability benefits.  (Id. at LL-0115.)  On appeal, Plaintiff's file

included new materials from her treating physicians as well as a second peer record review.

### a.      New Materials from Medical Experts

Plaintiff supplemented her original filing with new records from Dr. Greis and Dr.

Graham. (Id. at LL-0096–0117.)  Dr. Greis's records included notes from a December 6, 2011

appointment, in which Dr. Greis noted that Plaintiff "is doing the same if not worse" due to

persistent "chronic neck pain with radicular symptoms into the left posterolateral thigh and calf"

made "worse with standing and walking as well as prolonged sitting."  (Id. at LL-0101.)

Included in Dr. Graham's records was a letter dated March 26, 2012, addressed to those

evaluating Plaintiff's appeal.  (Id. at LL-0097.)  In that letter, Dr. Graham opined that:

> Having not seen the patient recently, I cannot state with confidence
> that this patient is necessarily disabled as she had been through
> 2010 and early 2011, but I can state with confidence that she was
> disabled from employment largely by virtue of chronic pain
> affecting the spine through the time that I was seeing her. . . . [I]f
> the patient was disabled previously at a time when she probably
> received maximum medical benefit, she is . . . very likely still
> disabled currently.

(Id.)

10

As part of the appeal process, Liberty Life submitted Plaintiff's file to Dr. Matthew Shatzer, a physical medicine and rehabilitation specialist with a focus in spinal cord injuries.  (Id. at LL-0089.)  Dr. Shatzer issued his report on April 10, 2012.  (Id.)  In addition to his review of Plaintiff's medical records, Dr. Shatzer reached out to Dr. Greis to discuss his treatment of Plaintiff.  (Id.)  Dr. Greis relayed to Dr. Shatzer his opinion that Plaintiff "cannot tolerate prolonged sitting, standing, walking, or lifting above 10 pounds."  (Id.)  In his peer review report, Dr. Shatzer stated that the medical records supported diagnoses of status post fall with concussion, cervical degenerative disc disease, lumbar spondylosis, bursitis, and chronic pain. (Id. at LL-0090.)  In light of this information, Dr. Shatzer opined that Plaintiff should have the following relevant restrictions:

> 1)  Lifting/Carrying/Pushing: 0–10 pounds no restrictions; 10–20 pounds frequently; 20–30 pounds occasionally; greater than 30 pounds never
>
> 2)  Sitting: No restrictions assuming the claimant is afforded the opportunity to change positions as needed for comfort
>
> 3)  Standing/Walking: Stand up to 4 hours daily and walk up to 4 hours daily; no greater than 30 minutes without being afforded to sit and rest for 5 minutes
>
> 4) Touching/Feeling/Handing: No restrictions
>
> 5) Reaching at and above the waist – frequent; reaching below the waist– occasional
>
> 6) Crouching and kneeling – Occasional

(Id. at LL-0090–91.)  While Dr. Shatzer stated that he believed "claimant's chronic pain would be exacerbated by exceeding the above restrictions" and described the restrictions as "permanent," he nonetheless concluded that, "the claimant should be able to tolerate full time

work capacity with the above mentioned restrictions and limitations."  (Id. at LL-0091.)

### b.  Plaintiff's Social Security Award

On April 2, 2012, eight days before Dr. Shatzer issued his peer review report and fifteen days before Liberty Life issued its decision on Plaintiff's appeal, the Social Security Administration ("Social Security" or "SSA") sent a letter to Plaintiff notifying her that it had determined that she was disabled under the SSA's rules.  (Id. at LL-0085.)  According to the SSA, Plaintiff's date of disability was September 13, 2010— her last day at Yellowbook.  (Id. at LL-0060, LL-0085.)  The SSA further determined that Plaintiff was eligible to receive benefits as of March 2011, and, as such, Plaintiff would receive a lump sum payment of $26,799.00, an amount equal to the twelve months of benefits she had been eligible to receive to that date.  (Id. at LL-0085.)  In a letter dated April 11, 2012, Plaintiff, through her counsel, notified Liberty Life of her Social Security award.  (Id. at LL-0084.)

### c.  Liberty Life's Denial of Plaintiff's Appeal

In a six-page letter dated April 17, 2012, Liberty Life denied Plaintiff's appeal of its decision not to pay her long-term disability benefits.  (Id. at LL-0070–76.)  In explaining the reasons for upholding its original finding that Plaintiff was not disabled, Liberty Life relied heavily on Dr. Shatzer's report, quoting his opinion nearly in full.  (Id. at LL-0074–75.)  The letter also made reference to "Dr. Rinh's [sic] exam on 10.30.10" stating that although he found "subtle decrease in bilateral EHL strength" and "[d]ecrease in lumbar spine range of motion," he "[did] not appreciate any significant weakness in [Plaintiff's] leg."  (Id. at LL-0072.)  Other references to Plaintiff's treatment include the note that, "[t]here is no evidence of side effects from medications that would result in further impairment," and receipt of Dr. Graham's letter of

March 26, 2012 stating his opinion that Plaintiff was likely disabled, characterizing the letter as "summariz[ing] her medical condition and treatment."  (Id. at LL-0074–75.)

Based on its review of the record, Liberty Life concluded that, "[i]n the absence of medical records to support impairment precluding [Plaintiff] from her occupation, she does not meet the definition of disability.  As such, the denial of benefits was appropriate and is supported by the record.  No benefits will be paid."  (Id. at LL-0075.)

### E.    Procedural History

Plaintiff initiated the present litigation on February 7, 2013.  The Complaint sets forth a single claim—that in denying Plaintiff benefits under Yellowbook's group long-term disability policy, Defendant Liberty Life violated section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

On November 14, 2013, Plaintiff filed her Motion for Summary Judgment.  Liberty Life filed its Cross-Motion for Summary Judgment on November 15, 2013.  On December 9, 2013, the parties filed their respective Responses in Opposition to Cross-Motions for Summary Judgment. The Motions are now ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims."  Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec., 475 U.S. at 586.  "There must . . . be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted."  Arbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231 (3d Cir. 1999).

Notably, "[t]he rule is no different where there are cross-motions for summary judgment."

Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).  As stated by the Third Circuit,

"'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary

judgment, and the making of such inherently contradictory claims does not constitute an

agreement that if one is rejected the other is necessarily justified or that the losing party waives

judicial consideration and determination whether genuine issues of material fact exist.'"  Id.

(quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.   DISCUSSION

Plaintiff brings her claims under section 502(a)(1)(B) of ERISA, 29 U.S.C. §

1132(a)(1)(B).  (Compl. ¶ 1.)  In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the

United States Supreme Court held that, when evaluating challenges to denials of benefits in

actions brought under 29 U.S.C. § 1132(a)(1)(B), district courts are to review the plan

administrator's decision under a *de novo* standard of review, unless the plan grants discretionary

authority to the administrator or fiduciary to determine eligibility for benefits or interpret the

terms of the plan.  Id. at 115.  Thus when, as here,[5] discretionary authority is given to an

administrator of a plan, a deferential standard of "arbitrary and capricious" is applied.  Id. at 111;

Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009); Kalp v. Life Ins.

Co. of N. Am., No. Civ.A.08-1005, 2009 WL 261189, at *1 (W.D. Pa. Feb. 4, 2009).  In such

cases, a court may overturn a plan administrator's decision only if that decision is "without

reason, unsupported by substantial evidence or erroneous as a matter of law."  Pinto v. Reliance

Standard Life Ins. Co., 214 F.3d 377, 387 (3d. Cir. 2000), abrogated on other grounds, Schwing,

---

[5] Plaintiff concedes "[t]he Court's review of the administrative record [is] in order to determine
whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits
determinations[.]" (Pl.'s Mot. Summ. J. 8 (citation omitted).)

562 F.3d at 525; see also Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1141 (3d Cir. 1993)

("[W]hen the arbitrary and capricious standard applies, the decision maker's determination to

deny benefits must be upheld unless it was 'clear error' or 'not rational.'") (internal quotation

omitted).  "The scope of this review is narrow, and 'the court is not free to substitute its own

judgment for that of the defendants in determining eligibility for plan benefits.'"  Doroshow v.

Hartford Life & Accident Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009) (quoting Abnathya v.

Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)); see also Howley v. Mellon Fin. Corp.,

625 F.3d 788, 793 (3d Cir. 2010); Brown v. First Reliance Standard Life Ins. Co., No. Civ.A.10-

486, 2011 WL 1044664, at *5 (W.D. Pa. Mar. 18, 2011).  Such a deferential review "promotes

efficiency by encouraging resolution of benefits disputes through internal administrative

proceedings rather than costly litigation."  Conkright v. Frommert, 559 U.S. 506, 508 (2010).

The fact that the plan administrator is also the payor of claims does not raise the level of scrutiny,

but may be considered as a factor among all others when determining whether a plan

administrator has abused its discretion.  Morgan v. The Prudential Ins. Co. of Am., 755 F. Supp.

2d 639, 642 (E.D. Pa. 2010) (citing Ellis v. Hartford Life and Accident Ins. Co., 594 F. Supp. 2d

564, 567 (E.D. Pa. 2009)).

On a motion for summary judgment in an ERISA case where the plaintiff claims that

benefits were improperly denied, a reviewing court is generally limited to the facts known to the

plan administrator at the time the decision was made.  Post v. Hartford Ins. Co., 501 F.3d 154,

168 (3d Cir. 2007), overruled on other grounds, 574 F.3d 230 (3d Cir. 2009).  "Consequently,

when, as here, a plaintiff alleges that a plan administrator, such as [the Fund's Trustees], abused

its discretion in deciding to terminate benefits, [the Court] generally limit[s] [its] review to the

administrative record, that is, to the 'evidence that was before the administrator when [it] made

the decision being reviewed.'"  Sivalingam v. Unum Provident Corp., 735 F. Supp. 2d 189, 194

(E.D. Pa. 2010) (quoting Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997)); see

also Johnson v. UMWA Health & Ret. Funds, 125 F. App'x 400, 405 (3d Cir. 2005) ("This

Court has made clear that the record for arbitrary and capricious review of ERISA benefits denial

is the record made before the Plan administrator, which cannot be supplemented during the

litigation.").

     Plaintiff makes four primary arguments in support of her Motion:[6] (a) Liberty Life

selectively reviewed the record and improperly relied on opinions by non-examining physicians;

(b) Liberty Life arbitrarily disregarded the Social Security Administration's award of disability

benefits; (c) Liberty Life has a conflict of interest between its roles as the insurer and

administrator of the policy; and (d) Liberty Life's denial of benefits was based on an incorrect

occupational analysis.  The Court will address each of these arguments separately.

     **A.     Liberty Life's Review of the Record**

     Plaintiff argues that Liberty Life was "arbitrary and capricious" in denying her long-term

disability benefits because it "selectively reviewed the record and improperly relied on opinions

by non-examining experts."  (Id. at 7.)  Specifically, Plaintiff argues that Liberty Life gave too

much weight to the peer record reviews of its medical experts, Dr. Weiss and Dr. Shatzer, and

omitted key findings of her treating physicians, Dr. Rihn, Dr. Greis, Dr. Graham, and Dr.

Belitsky.  (Pl.'s Mot. Summ. J. 7–15.)  Liberty Life responds that it did not ignore the opinions of

---

[6] Although the Court separately addresses both Motions for Summary Judgment, the Court will
consider the arguments raised in Plaintiff's Motion and accompanying briefs when ruling on
Defendant's Motion, and vice versa.

Plaintiff's treating physicians, and that, in any event, the opinions of Plaintiff's treating physicians were not entitled to any special weight.

Liberty Life is correct that it had no obligation "to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation why they credit reliable evidence that conflicts with the treating physician's opinion." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Nevertheless, ERISA plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician[.]" Id. In the present case, on the face of both the initial denial letter and the appeal denial letter, Liberty Life did not so much "refuse to credit" the records of Plaintiff's treating physicians as it neglected to address certain key portions of their findings.

In the initial denial letter, Liberty Life made merely cursory mention of Plaintiff's treatment from Dr. Rihn.[7] Liberty Life mentioned only that Dr. Rihn "[did] not verify any weaknesses in [Plaintiff's] leg upon exam" on November 30, 2010, and failed to account for any of Dr. Rihn's other findings. (R. at LL-0130.) This is a selective recounting of Plaintiff's treatment from Dr. Rihn, as most of his findings did not pertain to leg pain and focused more broadly on Plaintiff's severe lower back pain and neck pain. (R. at LL-0188–0197.) In summarizing the November 30, 2010, Liberty Life included Dr. Rihn's finding of no "weaknesses in [Plaintiff's] leg," but left out Dr. Rihn's findings of "persistent neck pain," "constant . . . back pain" caused by "a significant collapse at L4-5," and even "severe left leg pain, which goes down the left posterior thigh down to her knee." (Id. at LL-0188.)

---

[7] Liberty Life characterizes Dr. Belitsky's notes as "hand written and largely illegible." (R. at

Liberty Life's consideration of the treatment Plaintiff received from Dr. Greis is similarly incomplete.  While Liberty Life's letter mentioned that Plaintiff was experiencing "severe symptoms into the left buttock" on December 27, 2010, it further commented that "no focal strength defects are noted in the bilateral lower limbs" and that Plaintiff experienced only "mild pain" as of May 3, 2011.  (Id. at LL-0130.)  This fails to account for Dr. Greis's repeated references to Plaintiff's "[c]hronic low back pain with radicular symptoms into the bilateral buttock and left posterolateral thigh" made worse by "[s]itting, standing, walking, and bad weather[.]"  (Id. at LL-0153, LL-0157.)

Liberty Life's pattern of omission continued in its letter denying Plaintiff's appeal.  The totality of Liberty Life's summary of the records from Plaintiff's treating physicians were: 1) a recitation of Dr. Rihn's diagnoses from an October 30, 2010 examination; 2) a two-sentence summation of Dr. Greis's opinion that Plaintiff "could not tolerate prolonged sitting, standing, walking, or lifting above 10 pounds" due to "chronic pain from cervical and lumbar radiculopathies" and; 3) a note that it had "received a letter from Dr. Graham . . . [that] summarized her medical condition and treatment."  (Id. at LL-0072–75.)  By comparison, the denial letter includes a detailed full-page summary of the findings of its expert, Dr. Shatzer.  (Id. at LL-0074–75.)  In doing so, Liberty Life opted not to reconcile its finding of no disability with Dr. Graham's assessment that Plaintiff was "disabled from employment largely by virtue of chronic pain affecting the spine through the time that I was seeing her" and "if the patient was disabled previously at a time when she probably received maximum medical benefit, she is a [sic] very likely still disabled currently."  (Id. at LL-0097.)  Moreover, Liberty Life did not

LL-0129.)  After examining these records, the Court does not find fault with this description.

explain how, as Dr. Greis found, a person with "chronic neck pain with radicular symptoms into the left posterolateral thigh and calf" made "worse with standing and walking as well as prolonged sitting" could be expected to perform her "Own Occupation" as a sales representative without "standing and walking as well as prolonged sitting."  (Id. at LL-0101.)

Liberty Life's selective recounting of the treatment and diagnoses Plaintiff received from her treating physicians is analogous to the Third Circuit case of Michaels v. The Equitable Life Assurance Society of the United States Employees, Managers, and Agents Long-Term Disability Plan. 305 F. App'x 896 (3d Cir. 2009).  In that case, the plaintiff's treating physicians had written that the plaintiff's prognosis was "poor" and that he was "unlikely to be able to resume his previous work status" because the plaintiff could not sit longer than thirty to sixty minutes at a time without experiencing "severe" and "persistent" pain.  Id. at 905.  The Third Circuit found that the plan administrator had abused its discretion in part because the plan administrator, had "arbitrarily refuse[d] to credit [the plaintiff's] reliable evidence, including the opinions of . . . treating physician[s]."  Id. at 907 (quoting Nord, 538 U.S. at 834).

In the same vein as the plan administrator in Michaels, Liberty Life either ignored or made only cursory mention of the assessments from Plaintiff's treating physicians.  Liberty Life does not have a "burden of explanation when they credit reliable evidence that conflicts with the treating physician's opinion." Nord, 538 U.S. at 834.  Had Liberty Life addressed the findings of Plaintiffs' treating physicians or given a more complete recitation of those findings, however, its conclusion that Plaintiff was not disabled would be less vulnerable to a finding that it was "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Pinto, 214 F.3d at 387 (3d. Cir. 2000).  Even so, Liberty Life's failure to give full consideration to the

findings of Plaintiff's treating physicians is not dispositive of the question of whether Liberty

Life was "arbitrary and capricious," but rather is only one factor to consider among "the totality

of [the insurer's] actions."  Sanderson v. Cont'l Cas. Corp., 279 F. Supp. 2d 466, 477 (D. Del.

2003).

### B.     Liberty Life's Failure to Consider Plaintiff's Social Security Award

Plaintiff asserts that Liberty Life abused its discretion to deny her long-term disability

benefits because it ignored the Social Security Administration's determination that Plaintiff was

disabled.  (Pl.'s Mot. Summ. J. 16–17.)  Liberty Life responds that it was not bound by the SSA's

decision, and it could not consider the decision because Plaintiff only submitted a "summary

award letter" that did not discuss how the SSA arrived at its decision.  (Def.'s Resp. Opp'n Mot.

Summ. J. 13–14.)

Liberty Life is correct that an SSA award of benefits in a case where an ERISA plan

administrator denied benefits "'does not in itself indicate that an administrator's decision was

arbitrary and capricious, and a plan administrator is not bound by the SSA decision.'"

Brandeburg v. Corning Inc. Pension Plan for Hourly Emps., 243 F. App'x 671, 674 n.3 (3d Cir.

2007) (quoting Dorsey v. Provident Life & Accident Ins. Co., 167 F. Supp. 2d 846, 856 n. 11

(E.D. Pa. 2001)).  It is also true, however, that "an SSA award may be considered as a factor in

determining whether an ERISA administrator's decision to deny benefits was arbitrary and

capricious[.]"  Brandeburg, 243 F. App'x at 674 n.3.

To determine the proper weight to give Plaintiff's SSA award when examining whether

Liberty Life abused its discretion, it is instructive to compare the SSA definition of "disabled"

with the definition of "disabled" under Liberty Life's long-term disability policy.  Under the

Social Security Act, a person is "disabled" if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). More specifically, to qualify for Social Security disability benefits, a claimant must not only be "unable to do his [or her] previous work," but must also unable to "engage *in any other kind of substantial gainful work which exists in the national economy*." 42 U.S.C. § 423(d)(2)(A) (emphasis added). Conversely, in the long-term disability policy at issue in this case, Liberty Life defines "disabled" as "during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties *of his Own Occupation*."[8] (R. at LL-0008) (emphasis added).

While the SSA award letter does not state the SSA's reasons for its finding that Plaintiff was disabled, the SSA clearly found Plaintiff disabled under a far more stringent definition. Under the Liberty Life policy, a claimant is "disabled" if he or she is unable to "perform the Material and Substantial Duties of his [or her] Own Occupation." (R. at LL-0008.) Under the Social Security Act, a claimant is "disabled" if he or she is not only "unable to do his [or her] previous work," but also unable to "engage *in any other kind of substantial gainful work which exists in the national economy*." 42 U.S.C. § 423(d)(2)(A) (emphasis added). The fact that the SSA found Plaintiff disabled under this much narrower definition and Liberty Life's failure to

---

[8] The policy goes on to define "disabled" as "thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material Substantial Duties of Any Occupation." (R. at LL-0009.) Liberty Life concedes, however, that when considering Plaintiff's claim, its analysis was limited to "performing the material duties of her 'own occupation' as Advertising Sales Representative." (Def.'s Mot. Summ. J. 17.)

consider that fact in finding that Plaintiff was not disabled under its own broader definition gives this Court pause and must be "considered as a factor in determining whether an ERISA administrator's decision to deny benefits was arbitrary and capricious[.]" Brandeburg, 243 F. App'x at 674 n.3.

### C.      Liberty Life's Conflict of Interest as Insurer and Administrator

Plaintiff asserts that Liberty Life was "arbitrary and capricious" in denying her long-term disability benefits, due at least in part to Liberty Life's conflict of interest as both the insurer and administrator of Yellowbook's group long-term disability policy.  (Pl.'s Mot. Summ. J. 17.) Liberty Life responds that Plaintiff has failed to show it was influenced by any conflict of interest.  (Def.'s Resp. Opp'n Mot. Summ. J. 2–3.)

Prior to its decision in Estate of Schwing v. The Lilly Health Plan, the Third Circuit held that when deciding whether the dual administrator-insurer of an ERISA plan had abused its discretion, courts should use a "'sliding scale' in which the level of deference . . . accorded to a plan administrator would change depending on the conflict or conflicts of interest affecting plan administration."  562 F.3d 522, 525 (3d Cir. 2009) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989)).  Following the Supreme Court's decision in Metropolitan Life Insurance Company v. Glenn, 554 U.S. 105 (2008), which clarified that Firestone did not change the standard of review for ERISA cases to a *de novo* standard, the Third Circuit abandoned the "sliding scale" approach as "no longer valid."  Schwing, 562 F.3d at 525 (citing Glenn, 554 U.S. at 116).  Instead, the Third Circuit held that "courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board

23

and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." Id. at 525–26.

Here, Liberty Life argues that "Plaintiff has pointed to absolutely no evidence that supports her assertion that the structural conflict resulting from Liberty Life's dual status as decision-maker and payor of benefits played any role in the decision denying her claim for benefits." (Def.'s Resp. Opp'n Mot. Summ. J. 2.)  Any such evidence, however, would bear more directly on the question of where along the "sliding scale" a court should place "the level of deference . . . accorded to a plan administrator"— an approach that the Third Circuit has already discarded. Schwing, 562 F.3d at 525.  Instead, in keeping with Third Circuit precedent, the Court will consider Liberty Life's dual role as insurer and administrator of the plan at issue as "one of several factors in considering whether the administrator or the fiduciary abused its discretion." Id. at 525–26.

**D.     Liberty Life's Occupational Analysis**

Plaintiff asks this Court to find that Liberty Life abused its discretion because it was "based on an incorrect occupational analysis." (Pl.'s Mot. Summ. J. 17.)  Specifically, Plaintiff argues that the occupational analysis on which Liberty Life relied "improperly ignored the job requirements of [her] job, which the DOT and the job description clearly indicate involves at least light work." (Id. at 19.)  Liberty Life responds that "as performed in the national economy, [Plaintiff's] own occupation of Advertising Sales Representative was performed at both the sedentary and light physical levels" and that Plaintiff's "distinction between inside advertising sales representatives and outside sales representatives should be rejected."[9] (Def.'s Resp. Opp'n

---

[9] Liberty Life argues as a preliminary matter that the Court should not consider Plaintiff's "inside

Mot. Summ. J. 3, 5.)

Under the long-term disability benefit policy at issue in this case, a claimant is "disabled"

if "as a result of Injury or Sickness, [he or she] is unable to perform the Material and Substantial

Duties of his Own Occupation." (R. at LL-0008.) The policy defines "Own Occupation," as "the

Covered Person's occupation that he was performing when his Disability or Partial Disability

began. For the purposes of determining Disability under this policy, Liberty will consider the

Covered Person's occupation as it is normally performed in the national economy." (Id. at LL-

0012.)

In its initial letter denying Plaintiff benefits, Liberty Life acknowledged that Plaintiff's

job at Yellowbook required her to "frequently drive, sit 2–4 hours a day, stand 1–2 hours a day,

walk up to 5 miles per day, and carry up to 25 pounds up to 6 hours a day." (Id. at LL-0130.)

---

sales representative" versus "outside sales representative" argument because Plaintiff "never
raised this argument during the administrative appeal, nor did she submit any vocational or
occupational report rebutting the conclusions set forth in the September 1, 2011 vocational report
prepared by Liberty Life's vocational consultant." (Def.'s Resp. Opp'n Mot. Summ. J. 6.) In
support of this purportedly "well established" notion, Liberty Life cites two cases from courts
outside the Third Circuit. In its decision in Peruzzi v. Summa Medical Plan, the Sixth Circuit
stated that it was "doubtful" that the plaintiff should be able to make an argument to the district
court that it did not make before the plan administrator. 137 F.3d 431, 435 n.5 (6th Cir. 1998).
So far as the Court can tell, no part of Summa has ever been cited in a decision from within the
Third Circuit. Moreover, the Sixth Circuit made it clear that its "doubtful[ness]" was dicta, as it
went on to consider the merits of the plaintiff's argument in the next sentence which begins:
"Nevertheless we are unpersuaded[.]" Id. Liberty Life also cites the Tenth Circuit's opinion in
Sandoval v. Aetna Life & Casualty Insurance Company. 967 F.2d 377 (10th Cir. 1992). This
Court previously considered Sandoval in an ERISA case and concluded that "any reliance . . . is
misplaced because the instant case does not involve evidence obtained after the completion of the
administrative appeals process." Chmielowiec v. H.B. Fuller Co. Long Term Disability Plan,
No. Civ-A 02-7137, 2003 WL 21660030, at *4 n.3 (E.D. Pa. Jul. 15, 2003). What was true in
Chmielowiec is true here— Plaintiff is not attempting to introduce evidence that was not before
the plan administrator. Accordingly, the Court is not persuaded by the support Liberty Life cites
for its procedural argument that the Court should not consider an argument Plaintiff did not make
to the plan administrator.

Liberty Life's summary of Plaintiff's duties is consistent with Yellowbook's job description for the position Plaintiff held as "Client Services Representative." (Id. at LL-0295–96.) Yet Liberty Life found that "[Plaintiff's] occupation as a Sales Representative, Advertising as defined in the national economy, requires sedentary capacity" which entailed only "exerting up to 10 pounds of force occasionally, and/or a negligible amount of force frequently to lift, push, pull, carry, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." (Id. at LL-0130.) Liberty Life then concluded that Plaintiff was "capable of performing [her] occupation with a different employer." (Id.)

Liberty Life's determination that Plaintiff was capable of performing an occupation that involved "sitting most of the time, but may involve walking or standing for brief periods of time" (id.), it failed to address credible medical evidence that Plaintiff's "[c]hronic low back pain with radicular symptoms into the bilateral buttock and left posterolateral thigh" was exacerbated by, among other things, "[s]itting, standing, walking[.]" (Id. at LL-0089, LL-0101, LL-0106, LL-0153, LL-0157.) Indeed, the notes of Plaintiff's treating physicians include numerous indications that a job in which Plaintiff would be "sitting most of the time" would actually aggravate her symptoms because they became "worse with . . . prolonged sitting[.]" (Id.)

Moreover, this Court takes issue with the manner in which Liberty Life so readily disregarded Plaintiff's actual job duties when determining whether Plaintiff was able to perform her "Own Occupation." To that end, this Court finds the recent case of Kavanay v. Liberty Life Assurance Company of Boston highly persuasive. 914 F. Supp. 2d 832 (S.D. Miss. 2012). In Kavanay, Liberty Life had denied a claim for long-term disability benefits under the same "Own

Occupation" language at issue in the present case.  Id. at 833.  The plaintiff in Kavanay was an

insurance adjuster for Allstate whose job required him to "often work outside the office."  Id. at

835.  There, as here, Liberty Life denied the plaintiff long-term disability benefits on the basis of

its analysis that "the medical evidence did not prevent his performing sedentary work as an Inside

Claims Examiner."  Id.

Upon consideration of Liberty Life's attempt to construe the plaintiff's "Own

Occupation" as that of the "sedentary work of an Inside Claims Examiner," the Kavanay court

concluded as follows:

> Here, it is apparent that in selecting the sedentary position of Inside
> Claims Examiner from the D.O.T. as establishing the requirements
> of Kavanay's "own occupation," Liberty arbitrarily disregarded the
> nature of Kavanay's position with Allstate and the specific tasks he
> was required to perform as an Outside Claims Adjuster. Its
> consequent determination that Kavanay was not disabled because
> he was not medically precluded from performing the sedentary
> occupation of Inside Claims Examiner amounts to an abuse of
> discretion and cannot stand. It follows that Liberty's motion for
> summary judgment must be denied.

Id. at 836.

As it did in Kavanay, Liberty Life conflated Plaintiff's actual job duties requiring her to

travel from site to site with a job description that better suited its conclusion that Plaintiff's work

was sedentary.  This Court agrees with the Kavanay court's reasoning and its holding that such

an analysis under the "Own Occupation" language of Liberty Life's policy "amounts to an abuse

of discretion and cannot stand."  Id.

**E.**    **Totality of Liberty Life's Actions**

The Court has found the process by which Liberty Life decided to deny Plaintiff benefits

27

under its group long-term disability policy to be deficient.  Liberty Life's review of the record

was selective and incomplete, it failed to consider Plaintiff's award of disability benefits from the

Social Security Administration, it had an inherent conflict of interest as both the insurer and the

administrator of the policy, and it based its occupational analysis on an inaccurate description of

Plaintiff's "Own Occupation" under the policy.  This Court's inquiry is not limited to any one

factor, and must be "based on the totality of [the insurer's] actions."  Sanderson v. Cont'l Cas.

Corp., 279 F. Supp. 2d 466, 477 (D. Del. 2003).

Even acknowledging that the scope of review is narrow, and that the appropriate standard

in the present case is whether Liberty Life was "arbitrary and capricious," the Court's review of

the record reveals too many instances in which Liberty Life either ignored or failed to account for

significant evidence of Plaintiff's disability.  At each turn, it seems, Liberty Life placed a heavy

emphasis on the facts that most supported a finding that Plaintiff was not disabled while, at the

same time, refusing to acknowledge or otherwise reconcile its assessment with information that

undermined its finding.  By failing to address the main source or extent of Plaintiff's chronic pain

and misconstruing the duties of Plaintiff's "Own Occupation," Liberty Life demonstrated a

pattern of omission and an unwillingness to address the facts and opinions in the record that did

not directly bolster its decision.

When Liberty Life's slanted assessment is considered along with Liberty Life's dual role

as insurer and policy administrator, as well as Plaintiff's receipt of an SSA disability award under

a more stringent standard, the balance of the evidence in this case shows that Liberty Life did

more than exercise bad judgment.  Its finding that Plaintiff was not disabled was "clear error,"

"not rational," and otherwise "without reason, unsupported by substantial evidence or erroneous

as a matter of law."  Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1141 (3d Cir. 1993); Pinto,

214 F.3d at 387.  Accordingly, the Court concludes that Liberty Life's decision to deny long-term

disability benefits to Plaintiff was "arbitrary and capricious."

     **E.**     **Remedy**

     In its Motion for Summary Judgment, Liberty Life requests that, should the Court find

that Liberty Life abused its discretion in denying Plaintiff's claim for benefits during the "Own

Occupation" period, any retroactive benefits should "not extend beyond the time period ending

on March 13, 2013" and further requests that the Court "remand this matter to Liberty Life for

further administrative review and determination" as to Plaintiff's claim under the "Any

Occupation" provision of the policy.  (Def.'s Mot. Summ. J. 17–18.)  Plaintiff responds that

remand to Liberty Life is inappropriate as it should have "considered the plaintiff's eligibility for

both her 'own occupation' benefits for the appropriate period and 'any occupation' benefits

thereafter" when first considering her claim.  (Pl.'s Resp. Opp'n Mot. Summ. J. 8) (quoting

Addis v. Ltd. Long-Term Disability Program, 425 F. Supp. 2d 610, 621 (E.D. Pa. 2006)).

     Bearing in mind the high "abuse of discretion" standard applicable in this case, and

recognizing that the Court's review has been confined to Liberty Life's analysis under the "Own

Occupation" provision of its policy, the Court will not address the question of whether Plaintiff is

entitled to benefits under the "Any Occupation" provision of the policy.  Instead, the Court finds

Plaintiff entitled to benefits under the "Own Occupation" provision retroactive for the period

running from March 13, 2011 through March 13, 2013.  In accordance with the reasoning of this

Opinion, the Court will remand the case to Liberty Life for: (1) consideration of the amount

owed to Plaintiff; and (2) determining whether Plaintiff is entitled to benefits under the "Any

Occupation" provision of the policy.[10]

Accordingly, the Court will deny Liberty Life's Motion for Summary Judgment in its entirety and grant Plaintiff's Motion for Summary Judgment as to Liberty Life's liability under section 502(a)(1)(B) of ERISA pursuant to the "Own Occupation" provision of the policy.  The Court will deny Plaintiff's Motion as to liability under ERISA and damages owed under the "Any Occupation" provision of the policy.

## IV.  CONCLUSION

For all of the foregoing reasons, the Court will deny Defendant Liberty Life's Motion for Summary Judgment in its entirety, grant Plaintiff's Motion for Summary Judgment as to liability under the "Own Occupation" provision of the policy, and deny Plaintiff's Motion for Summary Judgment as to liability under the "Any Occupation" provision of the policy. The Court will remand the remainder of the case to Liberty Life for administrative review of whether Plaintiff is entitled to benefits under the "Any Occupation" provision of the policy.

An appropriate order follows.

---

[10] "Once a court has found an administrator's actions to be arbitrary and capricious, the court may either remand the case to the administrator or it can award benefits under the insurance policy. The court has considerable discretion in choosing which remedy to award.  Remand was the appropriate remedy for [insurer's] arbitrary and capricious original final denial of benefits . . . [T]he record as then developed was ambiguous about [plaintiff]'s entitlement to benefits and the record was insufficiently developed for the court to resolve the ambiguity."  Kaelin v. Tenet Employee Ben. Plan, No. Civ.A. 04-2871, 2007 WL 4142770, at *11 (E.D. Pa. Nov. 21, 2007) (internal citations omitted).  See also, Goletz v. Prudential Ins. Co. of Am., 425 F. Supp. 2d 540, 553 (D. Del. 2006) (citing Mitchell v. Eastman Kodak Co., 113 F.3d 433, 436 (3d Cir. 1997) (abrogated on other grounds)) ("The Third Circuit has recognized that remand may be an appropriate remedy when additional evidence must be considered by the administrator to resolve a factual issue.  The Third Circuit has also stated that a district court must be careful not to substitute its own opinion for that of the administrator.").